**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| TEXTRON FINANCIAL CORPORATION,<br><br>                      Plaintiff,<br>v.<br><br>ANGLER BOAT CORP.,<br><br>                      Defendant. | Civil No. 10-1545 (JRT/AJB)<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Hannah R. Stein, Jeffrey W. Jones, and Paul L. Ratelle, **FABYANSKE WESTRA HART & THOMSON, PA,** 800 LaSalle Avenue, Suite 1900, Minneapolis, MN 55402; Jill M. Johnson and William R. Bay, **THOMPSON COBURN LLP**, One US Bank Plaza, St. Louis, MO 63101, for plaintiff.

Marc A. Al, **STOEL RIVES LLP**, 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402, for defendant.

Defendant Angler Boat Corp. ("Angler"), a boat manufacturer, has moved to dismiss the complaint filed by Textron Financial Corp. ("Textron"), a company that until late 2008 provided floor plan financing to independent Angler boat dealers. When Angler failed to respond to Textron's complaint, the Court entered a default judgment against it on July 14, 2010. Angler now moves the Court to vacate the default judgment and dismiss the action for lack of personal jurisdiction. It also moves for attorney fees and costs. For the reasons stated below, the Court denies the motion.

# BACKGROUND

In its April 14, 2010 complaint, Textron alleges that Angler breached a Repurchase Agreement signed by the parties on October 28, 2005. (Compl. ¶¶ 22-27, Docket No. 1.) Under the Repurchase Agreement, Textron agreed to finance purchases of inventory from Angler by Angler boat dealers for retail sale. (*Id.*, Ex. 1.) Angler agreed that if Textron came into possession of Angler inventory financed for an Angler boat dealer, Angler would repurchase the products for an agreed upon "Repurchase Price." (*Id.* ¶ 3.)

After repossessing inventory financed for three Angler boat dealers, Textron made three repurchase requests of Angler for the inventory in 2009. (*Id.*, Exs. 2-4.) Angler did not repurchase the inventory. (Aff. of Richard Molyneux, Aug. 20, 2010, ¶ 34, Docket No. 20.) Textron sent a final demand letter to Angler on January 28, 2010, notifying Angler that it was in breach of the Repurchase Agreement, demanding payment for the amounts due, and threatening legal action in the event that Angler failed to remit payment. (Compl., Ex. 5, Docket No. 1.) Textron ultimately sold the inventory to mitigate its damages and filed suit, alleging breach of contract. (Molyneux Aff. ¶ 35, Docket No. 20.)

Angler's registered agent was personally served with a summons and complaint on April 20, 2010. (Docket No. 5.) Angler did not file a timely answer, contact Textron or its counsel, enter an appearance, or otherwise respond to Textron's complaint until July 22, 2010 when Angler first communicated with Textron's counsel. (Aff. of William

R. Bay, Aug. 23, 2010, ¶¶ 2-3, Docket No. 21.) By that time, the Court had entered a default judgment against Angler. (Docket No. 10.)

## ANALYSIS

I.     **STANDARD FOR VACATING A DEFAULT JUDGMENT**

Under Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk . . . must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing . . . . " Fed. R. Civ. P. 55(b)(1).

"Although the same factors are typically relevant in deciding whether to set aside entries of default and default judgments, [m]ost decisions . . . hold that relief from a default judgment requires a stronger showing of excuse than relief from a mere default order." *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 783 (8th Cir. 1998) (quotation marks omitted). "[W]hether conduct is excusable is an equitable determination that tak[es] account of all relevant circumstances surrounding the party's omission." *Id.* (quoting *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388, 395 (1993); *SICK, Inc. v. Motion Control Corp.*, No. 01-1496, 2002 WL 832609, at *2 (D. Minn. April 30, 2002). Relevant factors include "the danger of prejudice to the [plaintiff], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the [Rule

60(b)] movant, and whether the movant acted in good faith." *Pioneer Inv. Servs.*, 507 U.S. at 395. The Eighth Circuit considers the merit of the movant's defense a compelling factor. *Johnson*, 140 F.3d at 783.

Angler's motion to vacate the default judgment and dismiss the complaint is based on its argument that the Court lacks personal jurisdiction over it, rendering the judgment void under Fed. R. Civ. P. 60(b)(4). *See e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 598 (7th Cir. 2007).

## II. PERSONAL JURISDICTION

A plaintiff generally has the burden of proving facts to support personal jurisdiction once it has been challenged by a defendant. *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004). Some courts, however, shift the burden to the defendant to establish a dearth of jurisdiction on a collateral challenge to a default judgment under Rule 60(b)(4). *See, e.g.*, *"R'" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 126 (2d Cir. 2008). The Court concludes that it has personal jurisdiction over Angler regardless of which party bears the burden of proof.

"Because Minnesota's long-arm statute is 'coextensive with the limits of due process,' the only question is whether the exercise of personal jurisdiction comports with due process." *CBS Interactive Inc. v. Nat. Football League Players Ass'n, Inc.*, 259 F.R.D. 398, 404 (D. Minn. 2009) (quoting *Minn. Mining & Mfg. Co. v. Nippon Carbide Indus., Inc.*, 63 F.3d 694, 697 (8th Cir.1995)); Minn. Stat. § 543.19. "Due process requires 'minimum contacts' between the non-resident defendant and the forum state such that 'maintenance of the suit does not offend traditional notions of fair play and

substantial justice.'" *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980)).

"The central question" in determining whether Angler has sufficient minimum contacts with Minnesota under the Due Process Clause to support the Court's exercise of personal jurisdiction "is whether [it] has purposefully availed itself of the privilege of conducting activities in the forum state and should, therefore, reasonably anticipate being haled into court []here." *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003). "If a court determines that a defendant has minimum contacts with the forum state, it may then consider whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Dever*, 380 F.3d at 1073 (quotation marks omitted).

> In accordance with these principles, the Eighth Circuit has established
>
> a five-factor test . . . to determine the sufficiency of defendant's contacts. . . . (1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties.

*Burlington Indus.*, 97 F.3d at 1102. The first three factors are "of primary importance . . . ." *Id.*

"The Supreme Court has set forth two theories for evaluating minimum contacts, general jurisdiction and specific jurisdiction." *Dever*, 380 F.3d at 1073. This distinction relates to the third factor of the five-factor test, the connection between the cause of action and the contacts. *Digi-Tel Holdings, Inc. v. Proteq Telecommc'ns (PTE), Ltd.*, 89

F.3d 519, 523 n.4 (8th Cir. 1996). "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose." *Id.* Since the contacts supporting personal jurisdiction in this case arose from the dispute regarding the Repurchase Agreement, the Court considers only whether it has specific jurisdiction over Angler.

Angler argues that it has never had any contact with Minnesota, but undisputed record evidence is to the contrary. Although Textron is a citizen of Delaware and Rhode Island,[1] it prepared and administered the Repurchase Agreement from its office in Golden Valley, Minnesota. (Compl. ¶¶1-2, 13, Docket No. 1; Molyneux Aff. ¶¶ 13, 16-17, Docket No. 20.) The Repurchase Agreement was accepted by Textron's execution in Minnesota, and Textron's address on the agreement is listed as a post office box in Minnesota. (Molyneux Aff. ¶ 13, Docket No. 20; *id.*, Ex. D at 3.) Textron confirmed the start of its business relationship with Angler by sending a welcome letter from its Golden Valley office after the parties signed a previous Repurchase Agreement, also negotiated from and executed in Minnesota. (*Id.* ¶ 9.)

Textron administered the Repurchase Agreement in a manner requiring Angler to make multiple contacts with Textron in Minnesota each time an Angler dealer sought to purchase Angler products with financing from Textron. (*Id.* ¶ 17.) Before a dealer could

---

[1] Angler is a citizen of Florida incorporated under Florida law. (Compl. ¶¶ 4-5, Docket No. 1.)

purchase Angler inventory with Textron financing, Angler had to contact Textron in Minnesota to obtain its approval, by either calling the approval desk at Textron's Minnesota office or using an online system. (*Id.* ¶¶ 17-20.) After Textron communicated its approval of each transaction from its Minnesota office, Angler was required to contact the office again by either faxing or mailing an invoice for the inventory to be financed. (*Id.* ¶¶ 21-22.)

Between June 2004 and April 2009, Angler sent 804 separate invoices to Textron at its Minnesota office, for more than 1500 pieces of Angler inventory. (*Id.* ¶¶ 24-25.) Invoices identifying Textron as the purchaser used its Golden Valley, Minnesota office as an address. (*See, e.g.*, *id.*, Exs. E, F.) According to Molyneux, Angler was fully aware that Textron's financing program for Angler boat dealers was administered from and by Textron's Golden Valley office at the time it entered into the arrangement. (*Id.* ¶ 16.) Angler recognized a benefit of over $18,000,000 from June 2004 to April 2009 through the Repurchase Agreement. (*Id.* ¶ 30.) These continuous, knowing contacts with Minnesota over several years support the Court's exercise of personal jurisdiction over Angler.

Angler does not dispute **any** of the above facts, including its awareness that the Repurchase Agreement would be administered from Minnesota, nor the hundreds of transactions between it and Textron's Golden Valley office. Rather, it emphasizes its lack of physical contact with Minnesota. The Supreme Court, however, has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction." *Mellon Bank (East), PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1219 (3d Cir. 1992)

(citing *Burger King*, 471 U.S. at 476); *see also Peterson v. Harward*, No. A08-0153, 2009 WL 22254, at *2 (Minn. Ct. App. Jan. 6, 2009) (rejecting arguments that defendant "did not have sufficient contacts with Minnesota because he is not a Minnesota resident, because he was never physically present in Minnesota, and because the few contacts he made to Minnesota were by telephone, facsimile and e-mail.").

Angler also argues that execution of the Repurchase Agreement in Minnesota does not, by itself, confer personal jurisdiction over Angler. *See Digi-Tel Holdings*, 89 F.3d at 523 n.5. Indeed, the Supreme Court has "rejected the notion that personal jurisdiction might turn on mechanical tests or on conceptualistic . . . theories of the place of contracting or of performance." *Burger King*, 471 U.S. at 478 (citations and quotation marks omitted). In this case, it is not simply the execution or negotiation of the contract[2] but the **manner in which it was performed** – frequent, consistent interactions with Textron's Minnesota office – that warrants the Court's exercise of personal jurisdiction.[3]

This case is distinguishable from *Digi-Tel Holdings*, relied upon by Angler, in which a Minnesota company negotiated with a Singapore-based company in Singapore to manufacture cellular telephones. 89 F.3d at 521. On several occasions communicated with the company in Minnesota, but "[n]o part of the contract was to be performed in

---

[2] Angler asserts that it negotiated the Repurchase Agreement via email with Tom Wingate, a Textron employee who works from Pennsylvania. (Decl. of Gerritt Walsh, ¶ 3, Docket No. 14.) Wingate, however, apparently worked for Textron's Minnesota office, and the Repurchase Agreement, which listed a Minnesota address for Textron, was ultimately executed in Minnesota. (Molyneux Aff. ¶¶ 4, 13, Docket No. 20; *id.*, Ex. D at 3.)

[3] Angler also cites the Repurchase Agreement's Rhode Island choice of law provision, but the existence of such a provision is only a "secondary factor[] in the personal jurisdiction analysis." *Jennie-O Turkey Store, Inc. v. Food Movers Intern., Inc.*, No. 07- 1605, 2007 WL 2580599, at *4 (D. Minn. Sept. 5, 2007) (quotation marks omitted).

Minnesota" and "the negotiations, meetings, production, and delivery were all centered in Singapore." *Id.* at 525. By contrast, to perform its obligations under the Repurchase Agreement Angler frequently requested financing approval and sent invoices to Textron's Minnesota office. (Molyneux Aff. ¶¶ 17-22, Docket No. 20; *id.*, Ex. D at 1.) Angler sent 804 invoices to Textron's Minnesota office over a five year period—nearly one invoice every two or three weekdays. (*Id.* ¶26.) Far from the defendant's "inconsequential" contacts with Minnesota in *Digi-Tel*, Angler's contacts were integral to the parties' performance under the Repurchase Agreement. 89 F.3d at 525.

The Court concludes that the quality, quantity and nature of Angler's continuous contacts with Minnesota over many years in relation to the Repurchase Agreement establish that Angler purposefully availed itself of the privilege of conducting activities in Minnesota and should have reasonably anticipated litigating a dispute regarding the contract in this state.

The secondary factors – the interest of the forum state and convenience of the parties – do not undermine the Court's conclusion. Although Textron is not a citizen of Minnesota and Angler has identified numerous witnesses located outside Minnesota, Textron managed the Repurchase Agreement and its relationship with Angler from Minnesota, and "[a] plaintiff normally is entitled to select the forum in which it will litigate." *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1389 (8th Cir. 1995); *see also LOL Finance Co. v. F.J. Faison, Jr. Revocable* Trust, No. 09-741, 2009 WL 3381298, at *7 (D. Minn. Oct. 16, 2009) (finding nothing offensive to fair play and substantial justice in the exercise of specific personal

jurisdiction over defendants "in light of the length of the period of time over which defendants' contacts took place and the magnitude of the lending relationship that resulted . . . .").[4]

Accordingly, the Court will not vacate the default judgment, dismiss the complaint, or grant attorney fees and costs to Angler on this ground.

## III. OTHER ARGUMENTS IN SUPPORT OF VACATING THE DEFAULT JUDGMENT

While the default judgment against Angler is not void for lack of personal jurisdiction, Rule 60 also empowers the Court to vacate a default judgment if Angler can establish "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1).[5]

In this case, Angler waited over three months after being served with Textron's complaint to respond in any way. Although Angler asserts in a footnote that it objects to the effectiveness of service of process, it offers no facts or evidence in support of its objection.[6] (Mem. in Supp. of Mot. to Vacate Default J. at 3, n.1, Docket No. 13.) **Even**

---

[4] Moreover, the secondary factors are especially ancillary given the posture of this case, Angler attempting to collaterally attack a default judgment.

[5] Rule 60(b) enumerates several other grounds for vacating a default judgment, none of which are relevant in this case.

[6] Likewise, Angler asserts that the Repurchase Agreement is unenforceable because Textron terminated and/or superseded it, but proffers no record evidence to support this contention. Angler cites a letter regarding the obligations of Textron Financial Canada Limited, another Repurchase Agreement signatory which is not a party to this lawsuit. (Aff. of Troy J. Hutchinson, July 26, 2010, Ex. 1, Docket No. 15.) In any event, the letter clearly states that Angler's repurchase obligations under any existing agreements with Textron Financial Canada Limited will survive the termination of its financing program. (*Id.*) Angler also argues without

(Footnote continued on next page.)

**after Textron mailed Angler a copy of its request to enter a default against it on May 17, 2010, Angler made no attempt to contact Textron or its counsel.** (Docket No. 6; Bay Aff. ¶ 3, Docket No. 21.) A motion to vacate a default judgment cannot substitute for a timely filed answer. "A court will rarely excuse an intentional delay or disregard for deadlines and procedural rules." *SICK*, 2002 WL 832609, at *2. *See, e.g.*, *Hall v. T.J. Cinnamon's, Inc.*, 121 F.3d 434 (8th Cir. 1997). The Court finds Angler culpable for its failure to respond to this lawsuit in a timely manner and lacking in a meritorious defense. In the absence of excusable neglect, the Court finds no reason to vacate the default judgment.

## IV. DAMAGES

Angler argues that Textron failed to show how or if it mitigated its damages. Under Federal Rule of Civil Procedure 55(b)(1), however, a plaintiff establishes damages against a nonresponsive defendant by an affidavit showing "a sum certain or a sum that can be made certain by computation . . . ." The Repurchase Agreement specifies that Angler is to repurchase inventory from Textron in an amount equal to:

> (i) a percentage of the Invoice Cost of the Goods based on the length of time between the original Invoice date and the request for repurchase as set forth [in a table] plus (ii) all reasonable expenses incurred by Textron Financial in connection with the repossession and/or storage of such Goods (including legal fees), minus (iii) amounts incurred by [Angler], if any, to restore such Goods to the reasonable equivalent of unused condition (excluding normal wear and tear incident to display or demonstration) . . . .

---

(Footnote continued.)

citation that Textron refused to allow Angler an opportunity to try to resell the inventory. Without evidentiary support, the Court will not consider these defenses meritorious.

(Molyneux Aff., Ex. D at 2.) Textron submitted the affidavit of its vice president of sales following the formula set forth in the Repurchase Agreement with its application for default judgment, supporting its claim for damages in the amount of $90,495.99. (Docket No. 8, Ex. 1.)

The Repurchase Agreement anticipates that Angler will resell repossessed inventory after repurchasing it from Textron. (Molyneux Aff., Ex. D at 2, Docket No. 20.) However, Textron has asserted that because it was unable to obtain payment of the outstanding amount due from Angler despite numerous attempts, it sold the repossessed inventory in mitigation and then applied appropriate credits for those sales to the amount owing by Angler. (*Id.* ¶ 35; Compl. ¶ 20, Docket No. 1.) Angler has proffered no evidence that would lead the Court to question the accuracy of Textron's calculation.

**ORDER**

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that Angler's Motion to Vacate Default Judgment, Motion to Dismiss for Lack of Personal Jurisdiction, and Motion for Attorneys' Fees and Costs [Docket No. 11] is **DENIED**.

DATED: January 31, 2011             ____s/ John R. Tunheim____
at Minneapolis, Minnesota.               JOHN R. TUNHEIM
                                                    United States District Judge